OREN B. THOMPSON *versus* INHABITANTS OF BRIDGTON.

Where a town voted a bounty " to every person who may volunteer and be mustered into the service of the U. S., on the quota of the town under" a specified " call for troops," and the plaintiff, on his own motion and without the knowledge or consent of any agent of the town, volunteered and caused himself to be mustered in and credited on such quota; — *Held*, that the plaintiff must, in order to recover the bounty, prove that, at the time he enlisted, the quota of the sub-district comprising the town, was not full. ,

A letter, signed by the head clerk of the district provost marshall's office, and addressed to the selectmen of the town, stating that he is " directed by the provost marshall of the district to inform them that the credits of two drafted men (specifically named therein,) have, by order of the provost marshall general, been revoked," is not legal evidence of the facts therein stated.

ON REPORT.

ASSUMPSIT to recover a town bounty for enlistment into the service of the United States, April 12, 1865. The town, at a regular meeting, among other things, chose an agent to fill the quota, and "fully empowered him to make contracts with any and all persons for the purpose of filling the quota, and to procure men to be credited on said quota," &c. The remaining essential facts appear in the opinion.

*David Hale*, for the plaintiff.

*Strout & Gage*, for the defendants.

KENT, J. — The plaintiff claims to recover of the defendants six hundred dollars, as due to him under and by virtue of a vote of the town of the following tenor : —

"Voted, that there be paid to each of the following classes of persons the sum of seven hundred dollars, less the sum that may be actually paid them by the paymaster or other constituted authority of the State of Maine.

"1st. To every person who may volunteer and be mustered into the service of the United States *on the quota* of the town under the present call for troops."

The plaintiff in his writ alleges that he did thus enlist and that he was duly mustered into the service of the United States. He does not allege or claim that he made any contract with any officer of the town, or that the town or any of its agents or officers knew of his intention to enlist, or that he had enlisted, until after he had been mustered in. On the contrary, he testifies that "he volunteered for Bridgton on his own motion, and without any agreement either with the committee of the town to fill the quota, or any of the town officers." But he claims that he did in fact do all that the vote required to enable him to claim and recover the bounty promised in the vote. It is clear that, when a man thus assumes to act without consultation with or reference to the municipal authorities, he at best places himself in a position which requires the strictest proof of the existence of all the facts necessary to establish the liability. He must show, as the foundation of his claim, that, at the time he enlisted, the quota of the town was not full, that there was a deficiency existing, which the town, or rather, strictly speaking, the inhabitants residing within its limits and liable to draft, must supply. Towns, in their corporate capacity, were under no legal obligation to furnish recruits.

The prominent point in the specifications of defence in this case is, "that when the plaintiff enlisted, the quota for Bridgton, for the call for men mentioned in the plaintiff's writ, was filled." What are the facts, as they appear upon the papers and the testimony, on this point? It is admitted by the counsel for the plaintiff that, at the end of March, 1865, according to the rolls and records, kept by the proper authorities, there was no deficiency in the quota of Bridgton. But it is alleged that, between that date and the 12th of April, when the plaintiff enlisted, two of the credits before given had been revoked, and therefore a deficiency existed at that time. How far it was legal for the authorities of the United States to revoke and annul a credit before given, where the men had been accepted, mustered in and

counted on the quota, it is not necessary to consider. We can find no proper or sufficient evidence that any such revocation was ever made by any officer authorized to make it.

The plaintiff relies for legal proof of this fact upon a letter dated April 8, 1865, addressed to the selectmen of Bridgton, from the provost marshal's office of the first district of Maine, and signed by R. I. Hull, clerk, which informs the selectmen that he (the clerk) is directed, by Capt. C. H. Doughty, to inform them that the credits of I. E. Gammon, and I. E. Mills, drafted last September, have (by order of the provost marshal general) been revoked. " When the men are found they will be allowed."

It requires no argument or authorities to show that this letter is not legal or sufficient evidence of the facts therein stated. It is not testimony on oath, and not even a transcript of any record. It does not state that the act of revocation has actually been performed. It simply says, that Capt. Doughty directs him to inform them that two credits have been revoked. But notification to a party that a certain act has been done is not legal evidence that it has been done. If it were so, then a notice by a notary public to an indorser that a note had been presented, and payment demanded and refused, would itself be proof of those facts. If the facts stated in a notice are otherwise proved, then the statements in the letter show, and only show, that the selectmen were notified of the facts. But it cannot dispense with proof that the thing was in truth and fact legally done. This it does not purport to do.

The circulars from the provost marshal's office, put into the case, are simply directions to govern the action of the assistants, but are not in themselves decisions in particular cases. They do not order the officers in charge to strike off or cancel any credits already given, and where the men have been accepted and mustered in.

The testimony of R. I. Hull, on this point, is, that " the credit of two drafted men, under a previous call, was made under an order by the provost marshal general." This

shows that the men had been credited by the proper authority. Mr. Hull also says, that it was not the custom (in the office) to hold towns responsible to supply the places of drafted men, who had been examined and then deserted. When a drafted man was examined and accepted, he so far became a soldier, that the town was entitled to be credited for him, even if he afterwards deserted.

This would also seem to be confirmed by the views of Capt. Doughty, as expressed in the letter before quoted, when he says that "when the two men are found they will be allowed." From this it would seem, that the ground on which the credit was revoked, was the *desertion*, and not the fact that they had been *wrongly credited originally*.

The witness Hull further says, that the revocation was not made under the directions of the circular in the case, "but he *supposed*" they received another order, which was not produced, to revoke the credits of drafted men, and then they revoked this credit, and wrote upon the book of quotas and credits, under the record on the February return, that being the month in which the credits were first made, the words, "these credits revoked by order of the provost marshal general."

But *that order* is not produced, nor its non-production accounted for. The witness only says he supposes such an order was received. It is not pretended that the credits were cancelled by any other officer or by any other order, or that they could be. On the last day of March, the quota, as it is admitted, was full. The town then stood clear on the record. If, between that day and the 12th of April, the record *could be* altered, so as to charge the town again, it could clearly only be done by a distinct and definite order to that effect. The understandings, beliefs and suppositions of clerks or assistants cannot supersede the necessity of the production of the order, or a sufficiently authenticated copy of it.

The plaintiff, therefore, has failed to produce legitimate and sufficient proof that, on that 12th of April, after the surrender of Gen. Lee, when he, without the request or

knowledge of the town or its agents, procured himself to be credited on the quota of the town, the quota was not full, but that a vacancy existed, into which he might foist himself and then claim the promised bounty of six hundred dollars.

This view renders it unnecessary for us to consider several other grave and weighty objections to the plaintiff's recovery, which have been presented.

According to the terms of the report, the entry must be

*Judgment for the defendants.*

APPLETON, C. J., WALTON, BARROWS and DANFORTH, JJ., concurred.

TAPLEY, J., did not concur.